**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| v. | : | **CRIMINAL NO. 25-CR-82 (GAM)** |
| **MARK ANTHONY TUCCI** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Mark Tucci hurled threatening racial epithets at two different unsuspecting victims, first by screaming slurs at a motorist on I-95 and throwing a glass mug at the victim's car, and then by repeatedly threatening and cyberstalking a worker of an agency of the City of Philadelphia who was assigned a case involving his family member. For the reasons set forth below, the government recommends a sentence of incarceration within the advisory guideline range of 33 to 41 months and restitution for the victims in the amounts of $1,703.92 and $14,825.52 respectively, absent any basis for a below-guideline sentence addressed in the supplemental sealed attachment to this sentencing memorandum.

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025).[1]

---

[1] Courts previously followed a three-step process, in which the court first calculated the guideline range, then next ruled on motions for departure, before considering the 3553(a) factors. *See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). In an extensive amendment to the Guidelines effective November 1, 2025, the Sentencing Commission eliminated the departure provisions in the manual and dictated the two-step process described above.

At the second step of the sentencing process, "[t]he record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted). *See also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."); *United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any such argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.").

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors.

I. **BACKGROUND**

On August 21, 2025, the defendant pleaded guilty to an information charging him with one count of interference with a federally protected activity, in violation of 18 U.S.C. § 245(b)(2)(B) (Count One), one count of cyberstalking in violation of 18 U.S.C. § 2261A(2)(B) (Count Two), one count of interstate communication of threats in violation of 18 U.S.C. § 875(c) (Count Three), and one count of interference with a federally protected activity in violation of 18 U.S.C. § 245(b)(2)(C) (Count Four). The defendant pleaded guilty pursuant to a plea agreement that did not specify any recommendation as to the sentence that should be imposed. D.I. 34, 36, 39. At the plea hearing, the defendant agreed to the following facts:

**February 2024 Conduct (Count One)**

On February 1, 2024, just before 9:00 a.m., Victim 1—who, as relevant to this case, is African-American—was driving southbound on Interstate 95 ("I-95") to work. I-95 was and is a public road and interstate highway that runs through multiple states including Pennsylvania. Presentence Investigation Report ("PSR") ¶ 8. It was and is federally funded and administered by the states and their subdivisions, including the Commonwealth of Pennsylvania. *Id.* Traffic was heavy as it was rush hour. As Victim 1 approached her exit in Northeast Philadelphia, the defendant pulled up next to Victim 1 on her right side and rolled down his driver side window. *Id.* ¶ 9. The defendant screamed at Victim 1, "N***er [expletive]! Oh you're a n***er [expletive]! I'm going to kill you n***er [expletive]!" *Id.* The defendant continued to scream, "I'm going to kill you n***er [expletive]! I'm going to shoot you!" *Id.* The defendant then reached down into his car, pulled out a glass mug containing coffee, and threw it at Victim 1's car, denting it. *Id.* Victim 1 was terrified. *Id.* Victim 1 believed that when the defendant reached down into his car, he was reaching for a firearm. *Id.* Victim 1 pulled off I-95 and felt that she was having a panic attack. *Id.* Victim 1 called the police. *Id.*

A.  **June 2024 Conduct (Counts Two through Four)**

The defendant started contacting an agency of the City of Philadelphia ("Philadelphia Agency 1") in April 2024 to inquire about the status of a pending investigation relating to a family member. PSR ¶ 10. On or about the afternoon of June 3, 2024, the defendant used his cellular telephone, a facility of interstate commerce, to call Philadelphia Agency 1, and was connected to Victim 2, who was employed by Philadelphia Agency 1. *Id.* ¶ 11. When Victim 2 answered the defendant's call in Victim 2's capacity as an employee of Philadelphia Agency 1, the defendant became irate and started yelling. *Id.* Victim 2 asked him to stop yelling, and the

defendant did not stop. *Id.* Victim 2 hung up on him, and the defendant called back and continued to yell at Victim 2. *Id.* Victim 2 hung up again. *Id.*

On that same day, June 3, 2024, the defendant sent at least six e-mails, which were sent in interstate commerce, using his personal e-mail address, to Victim 2's e-mail with the subject lines, "N***er" [expletive], "Fat lazy n***er [expletive]," "Typical racist n***er [expletive]," and "No one was yelling fat lazy n***er [expletive]." *Id.* ¶ 12. One of the defendant's e-mails to Victim 2 said, "You motherfuckers are gonna regret this shit. First time your lazy koolaid drinking ass picked up in weeks. Then you hang up on your complicit in protecting these creeps let's hope they protect you n***er [expletive] Thank You Mark." *Id.* As relevant to this case, Victim 2 is African American. *Id.* Victim 2 feared for her life. *Id.*

Then, the defendant sent text messages to Victim 2 on Victim 2's personal cell phone. *Id.* ¶ 13. Victim 2 had not provided, and had never provided, the defendant her personal cell phone number. *Id.* In these messages, the defendant mentioned Victim 2 by name, mentioned the name of the street on which Victim 2 resided at that time, and said: "This is personal now … You wanna fuck with my family … Now your [sic] fucked." *Id.* The defendant then wrote, "Can't hang up on me in person c*nt." *Id.* In total, the defendant sent, in interstate commerce, approximately eight text messages to Victim 2. *Id.*

The defendant continued to call Philadelphia Agency 1 on that same day, June 3, 2024. *Id.* ¶ 14. That afternoon, the defendant was connected to another employee of Philadelphia Agency 1 (hereinafter "Witness 1"). *Id.* The defendant was irate and repeatedly called Witness 1 a "n***er [expletive]." *Id.* As is relevant to this case, Witness 1 is African-American. *Id.*

Using the caller ID from the Witness 1's phone, Witness 1's manager (hereinafter, "Witness 2") called the defendant back. *Id.* ¶ 15. The defendant answered and immediately began yelling

- 4 -

at Witness 2 about the investigation relating to his family member. *Id.* The defendant demanded the records from the investigation. *Id.* He then said he wanted to talk to Victim 2, whom he specifically mentioned by name. *Id.* The defendant said he was going to come down to Philadelphia Agency 1 tomorrow and "hurt everyone." *Id.* He also said he knew Victim 2's address and he was going to hurt Victim 2. *Id.* The defendant repeatedly used the word "n***er [expletive]." *Id.* Philadelphia Agency 1 immediately reported the defendant to the Philadelphia Police Department. *Id.*

### B. Evidence of Motive

The defendant also stipulated to the following evidence of the racial animus that motivated his conduct in the charged offenses. First, Tucci made a recorded call in April 2024 to another African-American employee of Philadelphia Agency 1 in which the defendant stated, among other things, "Hi, some n***er b*tch just called my fucking cell phone pretending to be a supervisor, some dumb fucking n***er … you hear me you fucking n***er … You sound like a fat n***er too. Put your fat n***er boss on the phone … I'm coming right down there now to see you guys. So I'll be there shortly. … If a n***er is going to fucking hang up on me when I'm trying to get help … Tell the FBI to fucking suck a dick too … ." PSR ¶ 17.

Tucci also placed calls to police in late May and early June 2024 that were recorded and contain evidence of his racial animus. In one of these calls, Tucci expressed concerns about being connected with an officer that he thought was Hispanic, saying, "Can you also say that if he's Hispanic, I'd rather be contacted by someone else. Because this involves race and it involves Hispanics being on one side, so I find it a bias already." *Id.* ¶ 19. After he was advised that the officer was not Hispanic, the defendant responded, "Ok great, that's even better then. Makes me feel a little better." *Id.*

Additionally, evidence of the defendant's racial bias was procured via search warrant from the defendant's iCloud. This evidence includes the full PDF file of "The Great Replacement," the manifesto written by Brenton Tarrant, who killed 51 and injured 49 at two New Zealand mosques; videos celebrating white supremacist accelerationism and Neo-Nazism, including multiple videos celebrating Nazi salutes and Hitler; racist images and memes; and songs from a white supremacist rapper that include numerous references to "killing n*****s" and creating an all-white society. *Id.* ¶ 20.

II.  **SENTENCING CALCULATION**

    A.  **Statutory Maximum Sentence.**

For Count One (interference with federally protected activities), where the defendant threatened the victim with use of dangerous weapon, the defendant faces a maximum penalty of 10 years' imprisonment, three years of supervised release, a $250,000 fine, and a $100 special assessment.

For Count Two (cyberstalking), the defendant faces a maximum penalty of five years' imprisonment, three years of supervised release, a $250,000 fine, and a $100 special assessment.

For Count Three (interstate communication of threats), the defendant faces a maximum penalty of five years' imprisonment, three years of supervised release, a $250,000 fine, and a $100 special assessment.

For Count Four (misdemeanor interference with federally protected activities), the defendant faces a maximum penalty of one year imprisonment, one year of supervised release, a $100,000 fine, and a $25 special assessment.

In total, the defendant faces a statutory maximum sentence of 21 years' imprisonment, three years of supervised release, a $850,000 fine, and a $325 special assessment.

B.     **Sentencing Guidelines Calculation.**

The Probation Office calculated the defendant's advisory guideline range as follows:

The Probation Office identified two groups under the rules in U.S.S.G. § 3D1.2. PSR ¶¶ 31-34. Group 1 relates to Victim 2. For cyberstalking under 18 U.S.C. 875(c), the Probation Office determined that the base offense level is 12, pursuant to § 2A6.1(a)(1). *Id.* ¶ 35. Six levels were added because the offense involved conduct evidencing an intent to carry out the threat under § 2A6.1(b)(1). *Id.* ¶ 36. Two levels were added because the offense involved more than two threats under § 2A6.1(b)(2)(A). *Id.* ¶ 37. Three levels were added if the Court determines at sentencing that the victim was selected because of race under § 3A1.1(a). *Id.* ¶ 38. This results in a total offense level of 23. *Id.* ¶ 41.

Group 2 relates to Victim 1. For using a dangerous weapon interfering with federally protected activities under 18 U.S.C. § 245(b)(2)(B), the Probation Office determined that the base offense level is 10, pursuant to § 2H1.1(a)(3)(A). *Id.* ¶ 42. Three levels were added if the Court determines at sentencing that the victim was selected because of race under § 3A1.1(a). *Id.* ¶ 44. This results in a total offense level of 13. *Id.* ¶ 47.

The total number of units is one, so zero units are added for the multiple count adjustment to the greater offense level, leading to a combined offense level of 23. *Id.* ¶¶ 48-51. Subtracting three points for acceptance of responsibility leads to a Total Offense Level of 20. *Id.*

¶ 55. Combining this with defendant's Criminal History Category of I leads to a Guidelines range of 33-41 months. *Id.* ¶¶ 55, 58, 118.

The government agrees that the Probation Office has correctly calculated the Guidelines range.

i. <u>The Defendant's Objection to the Guidelines Calculation</u>

The government contends, and the PSR likewise submits (*see* PSR ¶ 36), that an additional 3-level increase is warranted under U.S.S.G. § 3A1.1(a), based on the defendant's selection of the victims based on their actual or perceived race. Defendant objects to the application of the 3-level enhancement, arguing that his "mental health reports and acceptance of responsibility" make it so that the findings required for the upward departure cannot be satisfied. *Id.*, at 29. U.S.S.G. § 3A1.1(a) provides that, "in the case of a plea of guilty . . . the court at sentencing determines beyond a reasonable doubt that the defendant intentionally selected any victim . . . as the object of the offense of conviction because of the actual or perceived race," then the 3-level enhancement applies.

The standard for proving hate crime motivation for purposes of the sentencing enhancement is no more burdensome than for proving that the defendant acted "because of" a person's protected characteristic as is required under Section 245(b)(2). *See United States v. Smith,* No. 08-10386, 2010 WL 510634, at *6 (9th Cir. Feb. 12, 2010) (unpublished) (holding that there is "no textual basis for applying a different standard to the sentencing than to the conviction for hate crimes"); *United States v. Kaulana Alo-Kaonohi*, 2025 WL 1904472, at *4-6 (9th Cir. July 7, 2025) (finding that where a jury convicted defendant "because of" race under hate crime statute, it "necessarily found that Defendant intentionally selected the victim because of his race or color" such that the hate crime enhancement applied without a special finding);

- 8 -

*United States v. Sherifi*, 107 F.4th 309, 318-19 (4th Cir. 2024); *United States v. Popisil*, 186 F.3d 1023, 1031 (8th Cir. 1999). In pleading guilty to the violations of 18 U.S.C. §§ 245(b)(2)(B) and (b)(2)(C) as alleged in Counts 1 and 4, the defendant necessarily admits that he "willfully intimidated or interfered with" the two victims in these two incidents "because of their race or color." Dkt. 36, at 2-3. *See United States v. Woodlee*, 136 F.3d 1399, 1413-14 (10th Cir. 1998) (defendant's plea of guilt to hate crime conspiracy "necessarily includes an admission that he agreed to interfere with the victims because of their race," so the hate crime enhancement was properly applied by the court at sentencing). Further, the *mens rea* of "willfulness" required for a conviction under Section 245(b)(2) is higher than the "intentional selection" required under § 3A1.1.

The facts stipulated in the Plea Memorandum also clearly establish that the defendant intentionally selected his victims because of their race. D.I. 34, at 4-7. To prove that a defendant acted "because of" a victim's protected characteristic, the government must prove beyond a reasonable doubt "that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct." *Burrage v. United States,* 571 U.S. 204 (2014). A defendant's conduct is a but-for cause even "if the predicate act combines with other factors to produce the result, so long as the other factors alone would not have done so[.]" *Id.* at 211. The defendant used numerous racial slurs against both victims, as well as two of Victim 2's African-American colleagues. Neither victim knew or provoked the defendant in any way before he unleashed a tirade of threatening epithets at them. Tucci's history of using anti-African-American slurs, as well as the hateful, violent content found on his iCloud account, also establish his racial motive.

The "paranoid and impulsive behavior" defendant attributes to his mental health conditions are, at most, a second but-for cause along with his racial animus for the defendant's

viciously threatening behavior. Many perpetrators of hate crimes are driven to act on their animus, at least in part, by mental health challenges—including conditions that are far more acute than any of the disorders diagnosed in either of the two competency evaluations of the defendant.[2] *See, e.g.*, *United States v. Hudak*, 156 F.4th 405, 411 (4th Cir. 2025) (noting that "a criminal defendant may violently attack … *both* because of [someone's] race *and* because the defendant suffers from a mental illness that makes it challenging for him to control his behavior.") (emphasis in original); *United States v. Gregory Bush*, No. 3:18-CR-00188-CHB, Dkts. 69-71, 79-80 (W.D. Ky. 2021) (applying hate crime enhancement to defendant with paranoid schizophrenia who pleaded guilty to hate crime murder). While his mental health diagnoses may contribute to the defendant's lack of impulse control, they do not absolve him of the abhorrent racism that led him to take multiple steps to threaten both Victim 1 and Victim 2.

Finally, the defendant's claim that the hate crime enhancement should not apply to him because he accepted responsibility for committing two hate crimes is both a non sequitur and a contradiction in terms. First, the acceptance of responsibility is already addressed in a three-point downward adjustment. Second, in order for the defendant to truly accept responsibility for his actions, which include two hate crimes against African-American people, he must acknowledge that he selected his victims because of their race. Indeed, he has already done so in signing the plea agreement and allocuting at his change of plea hearing. In objecting to the application of the hate crime enhancement on these grounds, the defendant overreaches and his argument backfires. The defendant shirks responsibility by attributing his own actions exclusively to mental illness

---

[2] Defendant relies on Dr. Cooney-Koss's diagnosis of the defendant's schizoaffective disorder in making this argument. PSR, at 29. A second competency evaluation conducted by Dr. Ashley Jenkins diagnosed the defendant with generalized anxiety disorder and attention deficit/hyperactivity disorder, but not schizoaffective disorder. PSR, at ¶ 89.

rather than racial animus. Taken at face value, this argument should jeopardize the downward adjustment for accepting responsibility without undermining the sound rationale for applying the enhancement.

### III.     ANALYSIS

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 569 U.S. 530, 542 (2013) (quoting *Freeman v. United States*, 564 U.S. 522, 529 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 569 U.S. at 543. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.* at 544.

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been

found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

      **A.**      <u>**Consideration of the 3553(a) Factors.**</u>

           **1.**  <u>**Nature and Circumstances of the Offenses**</u>

The defendant hurled vicious, racist threats at two people with whom he had no prior connection and toward whom he had no basis for personal animosity. Both victims were engaged in their normal, productive daily routines—one on her morning commute to work, the other working on behalf of a city agency—and neither did anything whatsoever to provoke the defendant's ire. These threats were not one-off spasms of paranoia or random ill will. In both incidents, the defendant persistently and repeatedly communicated his bigotry and threats through multiple statements and actions. In the February 2024 incident, the defendant shouted numerous times that Victim 1 was a "n*****" whom he was going to "kill" and "shoot." He then rooted around his front seat, terrifying Victim 1 that he was looking for a firearm, and instead threw a coffee mug hard enough to dent the car Victim 1 was driving. And in the June 2024 incident, the defendant sent six racist, threatening e-mails to Victim 2, including "You motherfuckers are gonna regret this shit. First time your lazy koolaid drinking ass picked up in weeks. Then you hang up on your complicit in protecting these creeps let's hope they protect you n*****." He then found Victim 1's personal phone number and texted eight threatening messages, including one including Victim 2's name and home address. Later that afternoon, the defendant spoke to two more of Victim 2's colleagues over the phone, calling one of them a "n*****" and telling the other that he was going to hurt Victim 2 and knew where Victim 2 lived.

      Bias-motivated crimes such as these are particularly pernicious. By targeting the victims

because of their race, the defendant invoked some of the darkest moments of racial violence in our nation's history. He shattered the victims' sense of safety at work, on the road, at home, and while moving through the world. Victim 1 wrote that this incident "has caused unnecessary hyper vigilance and nervousness while driving and even navigating predominantly non-black spaces" and causes her to "brace myself if a car pulls up next to me or winds their window down." PSR, at ¶ 25. Both victims describe lasting and serious emotional repercussions from these incidents that had cascading effects on their lives, including requiring psychological treatment and missing work. Victim 2 also described the communal toll of threats like these: how Victim 2 had to inform "family, friends and neighbor about the threat" and get them "to stay on alert," and how she "distanced . . . from . . . colleagues, family and friends in case this unstable man tries to approach." *Id.*, at ¶ 23. The defendant's crimes were deeply destructive to the two victims and had repercussions for numerous of their associates. The defendant's sentence must reflect the seriousness of his bias-motivated offenses.

### **2. The Need for Deterrence and to Protect the Public**

A Guidelines sentence would promote the government's interest in specific deterrence and protect the public from further crimes committed by the defendant. The charges here arise from two separate incidents where Tucci brazenly—in broad daylight for Victim 1, and through easily traceable phone calls, texts, and e-mails to Victim 2—threatened African-Americans who were strangers to him, seemingly with no regard for potential repercussions. As noted above, Tucci has also demonstrated a troubling tendency to threaten other strangers in slur-filled tirades, causing the various targets of his hate-filled invectives to seek police protection. *Id.* at ¶¶ 16-19. These incidents demonstrate a persistent pattern of racist, violent and threatening misconduct. Imposing a Guidelines sentence would send the defendant a clear message that bigoted threats

and assaultive conduct are unacceptable.

Further, a significant custodial sentence is also necessary to promote general deterrence and respect for the law, and to provide just punishment for the offense. The defendant's actions terrified his victims, diverted the resources and attention of a city agency, and potentially jeopardized dozens of commuting drivers on a busy highway—all in the name of his unbridled hate. A lesser sentence would signal to the public that racially motivated threats are not deserving of the sanction that Congress and the Sentencing Commission have deemed to be just punishment based on the federal courts' collective sentencing expertise.

### 3. The Defendant's History and Characteristics and the Need to Provide the Defendant with Appropriate Medical Care

The defendant's history of violent and threatening conduct is related to his mental health issues. He has been diagnosed in successive competency evaluations with mental health disorders: first with schizoaffective disorder, bipolar type, generalized anxiety disorder, obsessive compulsive disorder, posttraumatic stress disorder, and caffeine use disorder, and then with generalized anxiety disorder and other specified attention deficit/hyperactivity disorder. PSR, at ¶¶ 88-89. Defendant's mental health challenges also appear have escalated in recent years, as evidenced by his string of arrests, involuntary commitments, and other harassing conduct, and his mother's report that "the anger exhibited in the instant offenses began in the last five years." *Id.* at ¶¶ 79, 92-93. He also has a history of substance abuse that interacts with his mental health challenges. *Id.* at ¶¶ 88, 92, 96-98.

While the defendant's mental health challenges explain his tendency to explode into an unprovoked rage on innocent strangers, they also underscore how important it is that his mental health well-controlled through monitoring and treatment prior to his release so that others are not harmed by his outbursts. The defendant has received psychiatric counseling and medication to

treat his mental health conditions while incarcerated, and the defendant is recommended to continue his medication as prescribed. Jenkins Competency Report, at 11. The clinicians who have evaluated the defendant's competency, and the defendant himself, describe the defendant's condition as having improved while he has been incarcerated and in treatment. Kooney-Coss Competency Report, at 8,18; Jenkins Report, at 11. A Guidelines sentence would allow for the defendant to continue to stabilize with treatment before he is released.

### 4. The Need to Provide Restitution to Victims

As part of his plea agreement, the defendant has agreed to pay all restitution as ordered by the Court. D.I. 36, at ¶ 6. The PSR indicates that, pursuant to 18 U.S.C. § 3663A and U.S.S.G. § 5E1.1, restitution shall be ordered in this case. PSR ¶¶ 127-128.

For Victim 1, the government requests $265.50 to compensate for Victim 1's wages lost as a result of this incident, as well as $1,438.42 to compensate for the damage the defendant caused to Victim 1's vehicle, for a total of $1,703.92.

For Victim 2, the government requests $2,736 to compensate for psychological treatment, and $12,089.52 representing 416.88 hours of unpaid leave under the Family Medical Leave Act ("FMLA"), for a total of $14,825.52.

Receipts for these items are attached hereto as Exhibits 1 (Victim 1) and 2 (Victim 2), respectively. These receipts are redacted because they contain personal identifying information (PII) of the victims and will be filed under seal. Unredacted versions of the receipts will be provided to the Court at the time of sentencing.

### I.    CONCLUSION

For the reasons set forth above, the United States requests that the defendant be sentenced to

a Guidelines sentence in the range of 33-41 months absent any basis for a below-guideline sentence addressed in the supplemental sealed attachment to this sentencing memorandum, two years of supervised release, to include mental health treatment.

                        Respectfully submitted,

                        DAVID METCALF
                        United States Attorney

                        */s/ Michelle L. Morgan*
                        MICHELLE L. MORGAN
                        Chief, Public Corruption & Civil Rights
                        Assistant United States Attorney

                        HARMEET K. DHILLON
                        Assistant Attorney General
                        Civil Rights Division

                        */s/ Samuel A. Kuhn*
                        SAMUEL A. KUHN
                        Trial Attorney

## **CERTIFICATE OF SERVICE**

I hereby certify that this Sentencing Memorandum has been served on the Filing User identified below through the Electronic Case Filing (ECF) system:

    Douglas N. Stern, Esquire
    1333 Race Street
    Floor 1
    Philadelphia, PA 19107
    dougstern@aol.com

    */s Michelle L. Morgan*
    MICHELLE L. MORGAN
    Assistant United States Attorney

DATED: November 25, 2025